| | |
|---|---|
| DISTRICT COURT, ROUTT COUNTY, COLORADO<br><br>Address: 1955 Shield Drive, Unit 200<br>Steamboat Springs, CO 80487<br>Telephone: (970) 879-5020 | DATE FILED: April 16, 2018 10:33 AM<br>FILING ID: A7ECFDEA776B8<br>CASE NUMBER: 2018CV30029 |
| Plaintiff: **MDM GROUP ASSOCIATES, INC.**<br><br>vs<br><br>Defendants: **JLT SPECIALTY LIMITED d/b/a LLOYD & PARTNERS LIMITED, a United Kingdom limited company; AMTRUST SYNDICATES LIMITED d/b/a AMTRUST AT LLOYD'S, a United Kingdom limited company; JOHN SMITH, an individual resident of the United Kingdom; and PETER YOUNG, an individual resident of the United Kingdom.** | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff:<br>Richard LiPuma, #17892<br>Joseph Carbon, #42072<br>*LiPuma Law Associates, llc*<br>1635 Foxtrail Drive<br>Loveland, Colorado 80538<br>Telephone: (970) 776-3292<br>Facsimile: (970) 674-9535<br>e-mail: lla@rlipuma.com | Case Number: 2018 CV ____<br><br>Division:<br><br>Courtroom: |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff MDM Group Associates, Inc. ("MDM"), by and through its attorneys, *LiPuma Law Associates, llc*, for its complaint against defendants JLT Specialty Limited d/b/a Lloyd & Partners Limited, AmTrust Syndicates Limited d/b/a AmTrust at Lloyd's, John Smith and Peter Young, alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff MDM is a Delaware corporation, duly registered to do business in Colorado, with its principal offices located at 2620 South Copper Frontage Road, Suite G-3, Steamboat Springs, Colorado 80477.

2. Defendant JLT Specialty Limited, d/b/a Lloyd & Partners Limited ("LPL"), is a United Kingdom limited company, registered in England, with its principal offices located at The St. Botolph Building, 138 Houndsditch, London EC3A 7AW, United Kingdom.

3. Defendant AmTrust Syndicates Limited, d/b/a AmTrust at Lloyd's, f/k/a ANV Syndicates Limited ("ANV"), is a United Kingdom limited company, registered in England and Wales, with its principal offices located at 47 Mark Lane, London EC3R 7QQ, United Kingdom.

4. Defendant John Smith is an individual who resides in the United Kingdom. Mr. Smith is employed by Ambris LLP, a non-party, whose business address is 140 Fenchurch Street, London EC3M 6BL, United Kingdom.

5. Defendant Peter Young is an individual who resides in the United Kingdom. Mr. Young is employed by Ambris LLP, a non-party, whose business address is 140 Fenchurch Street, London EC3M 6BL, United Kingdom.

6. This action is for breach of a contract made in the State of Colorado, breach of fiduciary duties, fraud, conspiracy, and tortious interference with contracts and prospective business relations. This Court has jurisdiction of such claims, and venue is appropriate pursuant to C.R.C.P. 98(c)(1), (2), (4) and (5) and C.R.S. §13-1-124(1)(a),(b), and (d).

## GENERAL ALLEGATIONS

7. MDM provides insurance and other financial products and services, including originally designed specialty products, to individuals and businesses.

8. In 2012, MDM developed an underwriting market and a specific proprietary "Description of Coverage" (copyright held by MDM), for marketing and selling a specialty insurance program called Trip Cancellation Program ("TCP"), which covers travelers against loss of unused, non-refundable or prepaid travel expenses in relation to vacation rentals when they are prevented from taking their trip, or if the trip is interrupted.

9. MDM has developed markets and Descriptions of Coverage for other specialty insurance programs, including Security Deposit Waiver ("SDW") and Renter's Legal Liability, underwritten by Lexington Insurance Company (a member of AIG).

### Relationship between MDM and London Parties

10. MDM's specialty insurance programs are underwritten by qualified and duly licensed insurers. The TCP was underwritten by a London-market insurance company, Jubilee Managing Agency Limited, for and on behalf of Lloyd's Syndicate 5820, f/k/a ANV Syndicate Management Limited, n/k/a AmTrust Syndicates Limited (hereinafter, "ANV") and backed by an insurance policy, the London Market Reform Contract. Exhibit 1.

11. In August 2012, MDM and ANV entered into a Trip Cancellation Program Licensing & Marketing Agreement (the "ANV Agreement"), whereby MDM was appointed as the sole marketing and sales representative for TCP, and ANV agreed not to create or offer a competing trip cancellation product during a period of "exclusivity," which is further defined by the Agreement. Exhibit 2.

12. ANV agreed to cooperate with MDM and provide reasonable assistance in marketing the TCP.

13. The ANV Agreement was for a term of three years, and automatically renewed for subsequent one-year periods, unless a written notice of non-renewal was provided to MDM at its Steamboat Springs, Colorado office 180 days or more prior to expiration.

14. London insurance market protocols require foreign-based insurance providers to utilize London-based brokers in placing business through London-based underwriters. Lloyd & Partners Limited (hereinafter "LPL") served as MDM's London-market agent, acting as the London placing broker for MDM's TCP and SDW programs. In this capacity, LPL served as broker of record for the London underwriter, ANV. Later, the ANV broker of record was changed to London broker, Ambris LLP ("Ambris").

15. As MDM's agent, LPL owed MDM fiduciary duties, including a duty of loyalty; a duty of good faith and fair dealing; a duty not to compete; a duty not to misappropriate key business opportunities; and a duty not to misappropriate MDM's confidential, proprietary and trade secret information.

16. John Smith ("Smith") and Peter Young ("Young") are London-based insurance brokers who were previously employed by LPL, from the inception of LPL's relationship with MDM until November 2014. Thereafter, from late November 2014 until March of 2015, Smith and Young were unaffiliated with LPL or any other London-based broker. Smith and Young have been employed by Coleman Ambris LLP n/k/a Ambris LLP since March 2015.

### MDM's Agreement with PAC7

17. PAC7, LLC is a U.S. insurance agency and provider of insurance services to the travel and property rental industry.

18. PAC7 administered an insurance program for the benefit of Royal Adventure Travel Group ("RATG"), a vacation rental association wherein the members were travelers and their guests, to whom PAC7 sold its products.

19. On August 24, 2012, effective as of September 1, 2012, MDM entered into a separate MDM/PAC7 Licensing & Marketing Agreement (the "PAC7 Agreement"), whereby MDM appointed PAC7 as its sole representative for marketing and selling the TCP in North America and the Carribean. Exhibit 3.

20. MDM also appointed PAC7 as its representative for marketing and selling the SDW and other MDM insurance programs.

21. MDM was to receive commissions on all PAC7 sales of Trip Cancellation and SDW coverage.

3

22. The PAC7 Agreement includes a "Revenue Protection Guaranty" under which MDM is entitled in perpetuity to commissions even if PAC7's customers switch to competing, non-MDM trip cancellation programs.

23. The Revenue Protection Guaranty applies to MDM's additional SDW and other programs as well.

24. Both the PAC7 Agreement and the ANV Agreement refer to, incorporate, and are subject to the insurance policy issued by ANV to RATG as a related and controlling instrument. The ANV policy includes a Market Reform Contract ("MRC").

25. The MRC contains a "Long Term Relationship Clause," providing that, although the RATG/PAC7 policy was issued on December 1, 2014, for a period of one year, all parties had agreed to a minimum of two mandatory one-year extensions–through December 1, 2017.

26. The MRC's Long Term Relationship Clause and the PAC7 Agreement's Revenue Protection Guaranty were included because MDM expended hundreds of thousands of dollars developing the TCP and did not expect to recover its costs for approximately two years.

### London Parties' Wrongful Conduct

27. During the executory period of the PAC7 Agreement, commercial disputes arose between MDM and PAC7. LPL and ANV interfered by encouraging and enabling PAC7 to bypass MDM as the U.S.-based surplus lines insurance broker, and otherwise avoid obligations under the PAC7 Agreement.

28. LPL established a direct relationship with PAC7 in October 2013, taking PAC7's Peter Djokovich to meet with ANV and MAPFRE Insurance representatives in London, without MDM's knowledge or consent.

29. After learning of the unauthorized meeting, MDM informed LPL that it was not to have any direct communication with MDM's clients and that MDM would need to be copied on all email communications and participate in all telephone conferences or in-person meetings between LPL and PAC7.

30. Despite assurances to the contrary, LPL, through its brokers, Smith and Young, continued to directly communicate with PAC7 and to facilitate direct communication between ANV and PAC7, without MDM's knowledge or consent.

31. In July 2014, LPL marketed MDM's TCP in London through other U.S. brokers, without MDM's consent or participation. MDM questioned LPL's actions and, in response, LPL contacted PAC7 to coordinate a response, in an effort to conceal their wrongful conduct.

32. In November 2014, Young sent an email to PAC7, which was copied to LPL employees Smith and Kristie Thorpe ( the so-called "Fellow Justice League Members"), indicating that all parties had recently participated in an "excellent conference" and discussing, among other things, LPL's recent contact with MAPFRE Insurance to implement an International Trip Cancellation Program. MDM was not included in this communication with its client, which also included reference to an upcoming meeting "with Dale [Willetts] and Andrew [Hall]" (of ANV) to discuss "renewal of the RATG."

33. Smith and Young, in their individual capacities, continued the improper relationship with PAC7. Smith and Young, on behalf of PAC7, communicated with representatives of MAPFRE in December of 2014, after leaving LPL and prior to joining Ambris.

34. Upon information and belief, Smith and Young violated restrictive covenants with LPL by retaining client files and continuing to broker agreements in their individual capacities, while intentionally and improperly interfering with MDM's existing and prospective contractual relations.

35. PAC7 / RATG subsequently changed its Broker of Record ("BOR") from LPL to Ambris in March of 2015. By the end of April 2015, Smith and Young, on behalf of Ambris, forwarded an agreement to PAC7, acknowledging that "after nearly three years we at last are dealing with PAC7 'officially' as our client." The BOR was changed from LPL to Ambris without consultation or notification to MDM.

36. Like LPL, ANV established a direct relationship with PAC7, breaching contractual obligations owed to MDM and conspiring to interfere with MDM's contractual relations with third parties.

37. On November 21, 2014, Dale Willetts and Emily Cameron at ANV had direct communication with PAC7. The parties confirmed that ANV was "eager to receive the monthly bordereaux directly from [Rental Guardian]" on behalf of PAC7 and that, while LPL was still the London broker for RATG TCP, "all parties acknowledged that once PYoung gets settled, we can follow up on this issue."

38. The November 21, 2014 communication also confirmed ANV and PAC7's plan to change "the Surplus Lines broker for RATP," namely MDM. "MDM will no longer receive 1.1% of RATP premium for Surplus Lines Brokering...as indicated on the attached PAC7 + MDM Agreement Revenue matrix; PAC7 will retain this 1.1%"; and "once we have notified Joe [McNasby - MDM's President], we will need to get with ANV to update the Surplus Lines Broker section of the MRC; our goal will be to do this prior to the 12-1-14 renewal; if not we can still request that London endorse the renewed policy reflecting this change."

39. On or about the same date in November 2014, LPL received draft language from PAC7, recommending that LPL "have your newly-assigned PAC7/MDM-servicing staff member write an email to MDM and PAC7 that states something in the neighborhood of... 'I will be in

5

close contact next week with Dale Willetts, Head of Underwriting Accident & Health at ANV, and coordinating internally with Kirstie Thorpe of our group, regarding renewal of the PAC7 Royal Adventure Travel Protection MRC, and update you regarding our progress."

40. In late January 2015, ANV communicated to MDM that it intended to cancel the MRC, effective 180 days after February 1, 2015. MDM pointed out that the MRC contains a Long Term Relationship Clause ("LTRC") (see MRC at p. 2 of 13), and in a subsequent telephone conference, representatives of ANV admitted that the LTRC precluded such termination. ANV therefore represented that it would honor its contractual obligations and continue with the TCP through December 1, 2017.

41. ANV and LPL were aware of ANV's contractual obligations. On September 23, 2014, Young stated by email: "we are very confident that ANV will renew the programme; in fact they have to, due to the long term relationship clause in the MRC."

42. Nevertheless, based solely on ANV's invalid notice of cancellation, PAC7 notified MDM in an email message dated February 28, 2015, that it would not renew the PAC7 Agreement after September 1, 2015.

43. PAC7 was unable to simply replace MDM as its broker of record for the ANV TCP because of its contractual obligations to MDM under the Revenue Guaranty Clause (PAC7 Agreement § 7) and MRC LTRC.

44. LPL and ANV conspired to induce non-renewal of the ANV Contract and related MRC. The conspiring parties incorrectly believed that, if ANV were to terminate the ANV Agreement and MRC, PAC7 would not have to pay commissions to MDM pursuant to the Revenue Guaranty Clause.

45. Prior to informing MDM that ANV would not renew, LPL received draft language from PAC7 outlining the intent to bypass contractual obligations owed to MDM and circumvent ANV's obligations under the MRC LTRC. Smith and Young, on behalf of LPL, reviewed the proposed language, made suggestions to "depersonalize" it, and offered to "work on the wording." Despite the fact that MDM was LPL's client, LPL's advice made clear who interests they were serving: "with regards to the letter, I think we could make it less complicated and go along the lines of that PAC7 have decided to pursue a direct relationship with admitted carriers and thanks for your help. Makes it less contentious."

46. On November 5, 2015, Dale Willetts and Andrew Hall of ANV participated in a conference call with MDM. Willetts assured MDM that ANV intended to follow the MRC LTRC and renew the Policy, that ANV had not directly communicated with PAC7, and that there were no regulatory issues jeopardizing the TCP.

47. In fact, ANV had established a direct relationship with MDM's client long before the November 5 telephone conference. Willetts met with PAC7 in October of 2014 and helped

6

develop a plan to take over the surplus lines tax filing responsibilities from MDM.

48. Significantly, ANV discussed a plan to assist PAC7 in circumventing its contractual obligations to MDM: "While it is PAC7's right to engage or disengage its US broker [MDM], the fact that there is an Agreement between Jubilee [ANV] and MDM, and that MDM is asserting the DOC copyright, that it will likely have to be the underwriter (ANV) that has to issue some business process revisions that enable PAC7 to change current elements of the RentalGuardian - to - PAC7 - to - MDM data and funds flow."

49. On December 1, 2014, ANV received a draft memo authored by PAC7 "to improve/accelerate the business process and hopefully provide a basis for a lower cost from the TPA." The communication concludes: "Subject to your approval, RentalGuardian (PAC7) is ready for you to send this out to the parties at your earliest convenience." ANV willingly participated in the conspiracy to defraud MDM.

50. ANV breached its contractual obligations by wrongfully terminating the Policy, in violation of the MRC LTRC. ANV also breached its obligation to cooperate with MDM and provide reasonable assistance in marketing the Trip Cancellation Program.

51. ANV's breaches were intentional and malicious.

52. ANV asserts that it cancelled the ANV Agreement and MRC, but ANV did not comply with the technical terms and conditions of the ANV Agreement and MRC regarding such cancellation.

53. LPL, ANV, Smith and Young intentionally interfered with MDM's relationship with PAC7 and with MDM's relationships and prospective relationships with clients purchasing Trip Cancellation and SDW coverage.

54. LPL and ANV fraudulently misrepresented and concealed material facts that were reasonably relied upon by MDM in maintaining its contractual relations.

55. As a direct and proximate result of ANV's violations of the ANV Agreement and MRC, and intentional interference with MDM's then existing and prospective business relations, MDM has suffered substantial losses and damages.

56. As a direct and proximate result of LPL's wrongful conduct, MDM lost its exclusivity arrangements with ANV, and LPL's wrongful conduct adversely affected ANV's willingness to continue the MDM programs after 2017.

57. MDM will incur future losses and damages directly and proximately caused by LPL, ANV and Smith and Young's wrongdoing.

58. MDM complied with its obligations under the ANV Agreement to attempt negotiation and mediation. ANV, LPL, Smith and Young have refused MDM's demand for mediation. MDM is still available for mediation if ordered by the Court.

## FIRST CAUSE OF ACTION–BREACH OF CONTRACT
(ANV)

59. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

60. The MDM/ANV Trip Cancellation Program Licensing & Marketing Agreement, including the Market Reform Contract, constitutes a valid and binding contract.

61. MDM performed its obligations under the ANV Agreement and MRC.

62. ANV breached the ANV Agreement and MRC.

63. ANV's breaches of contract have caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against ANV and for an award of actual damages, consequential damages, future damages, costs, attorney fees, prejudgment interest, post-judgment interest, and any other relief provided by law.

## SECOND CAUSE OF ACTION–BREACH OF FIDUCIARY DUTIES
(LPL)

64. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

65. By virtue of the ANV Agreement, MRC, and the relationship between the parties, LPL was MDM's agent and business partner. MDM placed a high degree of trust in LPL, and provided to LPL confidential, proprietary and trade secret information, as well as key business opportunities.

66. LPL owed MDM certain fiduciary duties, including without limitation: a duty of loyalty; a duty of good faith and fair dealing; a duty not to compete; a duty not to misappropriate key business opportunities; and a duty not to misappropriate MDM's confidential, proprietary and trade secret information.

67. LPL breached each of the above-referenced duties.

68. LPL's breaches of fiduciary duties were intentional and malicious.

69. LPL's breaches of fiduciary duties caused MDM to lose profits, will cause MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

70. Because LPL's conduct was intentional and malicious, MDM is entitled to recover attorney fees and punitive damages for LPL's breaches of fiduciary duties.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### THIRD CAUSE OF ACTION—FRAUDULENT CONCEALMENT
### (LPL and ANV)

71. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

72. During and after the effective dates of the PAC7 Agreement, ANV Agreement and MRC, LPL and ANV fraudulently concealed material existing facts that in equity and good conscience should have been disclosed. Specifically, LPL and ANV concealed that: PAC7 was discussing and developing competing Trip Cancellation and SDW products with third-parties; LPL and PAC7 were using MDM's protected and confidential marketing materials and other descriptive materials for the purpose of marketing competing products; LPL and PAC7 were planning to sell competing products to MDM's customers and potential customers; and LPL and ANV were assisting PAC7 in efforts to induce non-renewal of the ANV Agreement.

73. LPL's and ANV's concealment was intentional. LPL and ANV had knowledge of the facts being concealed from MDM.

74. MDM did not know the facts that were being concealed by LPL and ANV.

75. LPL and ANV intended that MDM continue to allow LPL and ANV to have access to MDM's confidential, proprietary and trade secret information during the period when LPL and PAC7 were developing competing products.

76. LPL and ANV intended that MDM continue to employ LPL and ANV as its representatives for selling the MDM products while LPL and PAC7 developed competing products.

77. LPL and ANV's fraudulent concealment of material facts, and MDM's acts and omissions caused by such concealment, caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL and ANV and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### FOURTH CAUSE OF ACTION–FRAUDULENT MISREPRESENTATION
### (LPL and ANV)

78. MDM incorporates by this reference all of the preceding paragraphs of this Complaint.

79. During and after the effective dates of the PAC7 Agreement, ANV Agreement and MRC, LPL and ANV fraudulently misrepresented material existing facts. Specifically, LPL and ANV represented that: PAC7 was not discussing and developing competing Trip Cancellation and SDW products with third-parties; LPL and PAC7 were not using MDM's protected and confidential marketing materials and other descriptive materials for the purpose of marketing competing products; LPL and PAC7 were not planning to sell competing products to MDM's customers and potential customers; LPL and ANV were not directly communicating with MDM's clients or assisting MDM's clients in efforts to induce non-renewal of the ANV Agreement; and that ANV intended to honor the MRC Long Term Relationship Clause.

80. MDM justifiably relied on material representations made by LPL and ANV.

81. MDM did not know the facts that were being misrepresented by LPL and ANV.

82. LPL and ANV's fraudulent misrepresentation of material facts, and MDM's acts and omissions caused by such representations, caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL and ANV and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### FIFTH CAUSE OF ACTION–TORTIOUS INTERFERENCE WITH CONTRACTS
### (All Defendants)

83. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

84. MDM had valid contractual and business relationships with PAC7, LPL, ANV, and customers purchasing Trip Cancellation and SDW coverage.

85. Defendants knew of these contractual and business relationships.

86. Defendants intentionally and improperly interfered with MDM's contractual and business relationships.

87. Defendants' intentional interference with MDM's contractual and business relationships caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL, ANV, John Smith and Peter Young and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### SIXTH CAUSE OF ACTION—TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
(All Defendants)

88. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

89. MDM had valid expectancy of prospective contractual and business relationships with ANV, its London-market brokers, other insurers and brokers participating in the MDM programs, and customers wishing to purchase Trip Cancellation and SDW coverage.

90. Defendants knew of these prospective business relationships.

91. Defendants intentionally and improperly interfered with MDM's prospective contractual and business relationships.

92. Defendants' intentional interference with MDM's prospective contractual and business relationships caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL, ANV, John Smith and Peter Young and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### SEVENTH CAUSE OF ACTION—CONSPIRACY
(All Defendants)

93. MDM incorporates by this reference all of the allegations stated in the preceding paragraphs of this Complaint.

94. Defendants agreed, by word or conduct, to tortiously interfere with MDM's existing contractual relationships with PAC7 and ANV.

95. Defendants, through improper conduct, caused and/or induced PAC7 and ANV to breach their existing contracts with MDM.

96. Defendants' conspiracy caused MDM to suffer substantial losses and damages, and MDM will continue to suffer losses and damages in the future.

WHEREFORE, MDM respectfully prays for judgment in its favor and against LPL, ANV, John Smith and Peter Young, and for an award of actual damages, consequential damages, future damages, costs, attorney fees, pre-judgment interest, post-judgment interest, and any further relief provided by law. MDM also intends to pray for an award of exemplary damages in accordance with § 13-21-102(1), C.R.S., at a time and in a manner consistent with the requirements of § 13-21-102(1.5)(a), C.R.S.

### JURY DEMAND

97. MDM demands a trial by jury for all causes of action.

Dated: April 16, 2018

Respectfully submitted,

*LiPuma Law Associates, llc*

*/s/ Joseph Carbon*

Joseph Carbon, #42072
Attorney for Plaintiff MDM

Plaintiff's Address:

2620 South Copper Frontage Road, Suite G-3
Steamboat Springs, Colorado 80477